**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| METANOIA and THE CITY OF NORTH CHARLESTON, | ) ) ) | |
| Plaintiffs, | ) ) | No. 2:21-cv-01291-DCN |
| vs. | ) ) | **ORDER** |
| XL INSURANCE AMERICA, INC. | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

This matter is before the court on plaintiffs Metanoia and the City of North Charleston's (the "City") (together, "plaintiffs") motion for partial summary judgment, ECF No. 55, and defendant XL Insurance America Inc.'s ("XL Insurance") motion for summary judgment, ECF No. 56. For the reasons set forth below, the court denies plaintiffs' motion for partial summary judgment, and grants in part and denies in part XL Insurance's motion for summary judgment.

## I.  BACKGROUND

Metanoia is a nonprofit organization incorporated for the purpose of building leaders, establishing quality housing, and generating economic development in North Charleston, South Carolina. A significant part of Metanoia's efforts have been devoted to revitalizing the Chicora-Cherokee neighborhood in North Charleston, which has one of the highest concentrations of child poverty in the state. Metanoia has enjoyed great support from the City, and the two have been working together for approximately twenty years.

1

Metanoia's efforts include a large-scale project to redevelop an abandoned elementary school known as the Old Chicora School ("Old Chicora"). The Charleston County School District (the "School District") ceased using Old Chicora in 2012 after it acquired property to build a brand new, modern school, and the City acquired title to Old Chicora and the property that it was located on (collectively, "the Old Chicora property") from the School District. ECF No. 56-38, MacConnell Dep. at 22:1–13. Old Chicora has been vacant since 2012. In approximately 2016, the City began searching for a partner to help turn the "historic building" into a "strategic building block" for North Charleston. ECF No. 55-1 at 1. The City identified Metanoia as a potential partner, and the two entities eventually settled on a plan to convert Old Chicora into a multi-use facility encompassing a performing arts center, an early childhood learning center, affordable artist work studios, and an educational space for the community, the entirety of which would be owned by Metanoia (the "Project").

To fund the Project, Metanoia needed to raise funds, secure tax credits, and acquire tax credit investment. Metanoia was able to successfully raise millions of dollars in cash donations and pledges. Metanoia also secured $11,923,650 in federal and state tax credits. Metanoia planned to ultimately purchase Old Chicora from the City in January 2020, but the closing on the transfer of title was later rescheduled to March 2020.

On February 28, 2017, the City and Metanoia signed an "option to lease" document that provided Metanoia with a lease option through February 28, 2019. ECF No. 59-2 at 4. In 2019, Metanoia paid $10,000 to extend the lease option for another

year.[1]  No written lease was ever signed.  However, Metanoia and the City began to

proceed as though the City had effectively given Metanoia "complete control" of the Old

Chicora property.  ECF No. 59-4, Summey Dep. at 48:25.  For example, Metanoia

engaged USI Insurance Services ("USI") to serve as its insurance broker for builders risk

insurance in November 2019.  USI approached XL Insurance about providing insurance

for the Project.  In doing so, USI's representative told XL Insurance's representative that

Metanoia had already purchased Old Chicora and that construction work on the Project

was "imminent."  ECF No. 56-7 at 2; ECF No. 56-33, Hockinson Aff. ¶¶ 4, 6.

In preparation for construction on the building, Metanoia and its general

contractor—Trident Construction, LLC ("Trident Construction")—determined that they

would need to commence demolition at the property prior to any construction work.

Metanoia and the City agreed that Metanoia's lease option allowed it to begin the

demolition work, even though no written lease had been signed.  On November 18, 2019,

the Office of Mayor Keith Summey issued a letter to Metanoia confirming the City's

belief that Metanoia was permitted to begin the demolition work.  ECF No. 55-12.  In the

same letter, the City wrote that "[i]t is understood by all parties that The City of North

Charleston will be listed as additionally insured on the general liability and builder's risk

policy."  Id.

XL Insurance issued the Builder's Risk Policy (the "Policy") on January 2, 2020

and bound coverage for the Project.  ECF No. 55-2.  The Policy named Metanoia and

Trident Construction, LLC as named insureds.  Id. at 14.  The Policy did not expressly

---

[1] The Resolution passed by the City stated that the lease option was to be extended by "one (1) year," ECF No. 59-2 at 15, but the lease amendment states that the closing date was extended by six months, id. at 16.

name the City.  ECF No. 55-2 at 57.  The Policy insured the Project for a total policy amount of up to $21,400,000, including $8,400,000 for damages to existing structures. ECF No. 55-2 at 15.  Metanoia paid the insurance premium of $98,870.

On February 8, 2020, a large fire broke out at Old Chicora.  The fire destroyed the auditorium and caused significant damage to other areas of the building.  Metanoia estimated that it would cost approximately $7,176,605 to repair and replace the parts of the building that had been destroyed.  Metanoia immediately filed a claim with XL Insurance.  Ten days later, on February 18, 2020, USI asked XL Insurance to endorse the Policy to add the City as an additional insured.  USI had not previously raised the request with XL Insurance and did so for the first time after the fire.  By letter dated March 20, 2020, XL Insurance cancelled the Policy, with an effective date of May 25, 2020.  ECF No. 56-5.

XL Insurance retained an outside adjusting firm, Engle Martin & Associates ("Engle Martin"), to assist with investigating the loss.  USI and a third-party public adjuster, Jim Pfohl ("Pfohl"), represented Metanoia.  During XL Insurance's investigation of the claim, it discovered that several of the representations made during the underwriting process were incorrect.  These misrepresentations included the fact that Metanoia had not yet purchased Old Chicora, that Metanoia did not have a written lease from the City, that construction was not imminent, and that the property was only partially fenced on the date of the fire.[2]

---

[2] XL Insurance asserts that the fire started after trespassers entered the property and started a fire in the auditorium.

Representatives of XL Insurance and Metanoia engaged in substantial back-and-forth regarding the terms of the coverage. For example, on April 16, 2020, a representative from the XL Insurance wrote a letter to Pfohl noting its determination that Metanoia did "not actually have a written lease for the property" and had "not yet exercised its option to purchase the property." ECF No. 55-3. Then, on August 7, 2020, Engle Martin sent a letter to Metanoia stating that its investigators had developed a preliminary repair estimate of $2,243,870.98. ECF No. 56-20 at 2. Engle Martin also hired an appraiser, who determined that the value of the property before the fire was $1,245,500. Id. Engle Martin explained that XL Insurance was only required to reimburse the latter amount—the actual cash value (as opposed to the replacement cost value)—because Metanoia had not yet completed repairs. Id. As such, XL Insurance ultimately resolved to pay $1.235 million, which was the actual cash value, less the policy deductible of $10,000. Id. The letter also reiterated XL Insurance's belief that Metanoia possessed a limited insurable interest in the property. Id. XL Insurance noted that Metanoia would not be entitled to any further recovery unless it provided information showing it had a greater interest in the Property than what the then-existing information indicated. On December 2, 2020, XL Insurance sent a letter to Pfohl confirming that the company would not be paying replacement cost value. ECF No. 56-24. On May 2, 2020, the City filed its own insurance claim but stated that any recovery for the City should be paid to Metanoia. ECF No. 56-29.

Once it became apparent that XL Insurance would not cover the entirety of the claimed damages, tax credit investors walked away from the Project and many donors rescinded their pledged money. Metanoia eventually purchased Old Chicora from the

City in April 2021.  ECF No. 55-9.  However, it has not undertaken any significant

repairs to Old Chicora, insisting that XL Insurance's refusal to pay coverage has left it

with "a multi-million-dollar hole that need[s] to be filled."  ECF No. 55-1 at 3.

On April 30, 2021, plaintiffs filed the instant action against XL Insurance.  ECF

No. 1-1.  On July 1, 2021, plaintiffs filed an amended complaint.  ECF No. 20, Amend.

Compl.  The amended complaint, now the operative complaint, alleges causes of action

for insurance bad faith, breach of contract, and negligence.  Additionally, plaintiffs bring

a declaratory judgment action and seek to reform the Policy to include the City as an

insured.  Id. ¶¶ 66, 74.  On July 15, 2021, XL Insurance filed its answer to the amended

complaint and raised a counterclaim for its own declaratory judgment.  ECF No. 24, Ans.

On September 27, 2022, plaintiffs filed their motion for partial summary

judgment.  ECF No. 55.  On October 17, 2022, XL Insurance responded in opposition.

ECF No. 60.  Plaintiffs did not file a reply, and the time to do so has now elapsed.  On

September 30, 2022, XL Insurance filed its motion for summary judgment.  ECF No. 56.

Plaintiffs responded in opposition on October 14, 2022, ECF No. 59, and XL Insurance

replied on October 21, 2022, ECF No. 62.  The court held a hearing on the motions on

January 5, 2023.  ECF No. 68.  As such, both motions have been fully briefed and are

now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c).  "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### III.  DISCUSSION

Plaintiffs and XL Insurance submit competing motions for summary judgment. Plaintiffs frame their motion as a motion for "partial summary judgment on [an] issue," ECF No. 55-1 at 18, arguing that they are entitled to full coverage for the fire damage under the Policy, on grounds that either (1) Metanoia has a fully insurable interest in the Old Chicora property, or (2) the City is an additional insured. XL Insurance's motion argues summary judgment is warranted in its favor on plaintiffs' (1) breach the contract claim, (2) reformation claim, and (3) bad faith claim. ECF No. 56. The court considers plaintiffs' motion under its cause of action for breach of contract while recognizing that the issue of whether plaintiffs are entitled to full coverage shapes their reformation and bad faith claims as well. The court addresses the breach of contract claim first, followed by the reformation and bad faith claims. The court ultimately grants XL Insurance's

motion for summary judgment on plaintiffs' request for reformation. But the court finds that there are genuine disputes of material fact as to all other issues where the parties seek summary judgment—namely, whether Metanoia is entitled to full coverage and whether XL Insurance acted in bad faith.

### A. Breach of Contract

Plaintiffs argue that there are two avenues for determining that XL Insurance breached the Policy by failing to fully insure the damage to the property. First, plaintiffs argue that Metanoia holds an insurable interest that entitles them to all benefits due under the Policy. Second, plaintiffs contend that the City is an additional insured. They conclude that a finding in favor of plaintiffs on either ground would mean that as a matter of law, the damages to Old Chicora were fully insured, and the parties would thus proceed to trial with that issue already decided. XL Insurance disputes that either Metanoia or the City are entitled to full coverage. Additionally, XL Insurance argues that under the Policy, it was not required to pay the Metanoia more than the actual cash value of the property in the absence of any repairs. The court analyzes plaintiffs' arguments about the Policy as it relates to each plaintiff before turning to XL Insurance's argument that no breach occurred even if plaintiffs were entitled to full coverage.

### 1. Metanoia's Insurable Interest

While investigating and reviewing Metanoia's claim, XL Insurance agreed that "Metanoia has some level of insurable interest in the Old Chicora renovation project."[3]

---

[3] In other words, XL Insurance does not argue that Metanoia possesses no insurable interest whatsoever. Nor could it. As South Carolina courts have explained, "anyone has an insurable interest in property who derives a benefit from its existence or would suffer loss from its destruction." Benton v. Rhodes, Inc. v. Boden, 426 S.E.2d 823, 826 (S.C. Ct. App. 1993) (quoting 43 Am. Jur. 2d Insurance § 943 (1982)).

ECF No. 55-3 at 2. Despite that acknowledgment, XL Insurance also expressed its belief that Metanoia's insurable interest was "difficult to measure" and limited Metanoia's ability to fully recover under the Policy. ECF No. 56-20 at 3–4. In a letter dated December 2, 2020, XL Insurance reiterated that Metanoia had "some level of insurable interest in the building, but that interest appears to have been limited to the amount spent by Metanoia in planning and preparing to renovate the building." ECF No. 56-24 at 3. As such, XL Insurance determined that Metanoia's insurable interest was capped at the amount that Metanoia had personally invested into Old Chicora. Id. XL Insurance calculated the "value" of Metanoia's insurable interest based on the expenses it incurred prior to the fire. Those costs, as set forth by Metanoia,[4] totaled $1,241,682.25. ECF No. 56-1 at 11 (citing ECF No. 56-47, Matthews Dep. at 168:23–169:6). Since this amount was "so close" to the actual cash value ("ACV") that XL Insurance calculated for the property, id. at 23 n.11, XL Insurance claimed it would simply pay Metanoia the ACV amount of $1.235 million, ECF No. 56-20 at 2. Despite agreeing to pay the ACV amount, however, XL Insurance maintained its belief that Metanoia only had some level of insurable interest and explained that unless Metanoia produced documentation showing it had a greater interest in the property, its recovery would be limited to the amount XL Insurance had already agreed to pay. ECF No. 56-24 at 3.

Plaintiffs argue that XL Insurance incorrectly made its determination about Metanoia's "level" of insurable interest. First, plaintiffs claim that the notion of "some" or "partial" insurable interest is unsupported by the law. Second, they argue that XL

---

[4] XL Insurance argues that this sum from Metanoia included costs that were incurred after the fire, but XL Insurance agreed to assume that the amount was accurate for purposes of resolving the insurance claim. ECF No. 56-1 at 11.

Insurance cannot explain how it unilaterally determined that Metanoia's insurable interest was limited. Related to the latter argument, plaintiffs also contend that even if an insurance contract could be broken into limited interests, the issue of whether Metanoia possessed a greater insurable interest than the amount XL Insurance calculated should be reserved for trial. The court considers each argument in turn.

### a. Concept of Insurable Interest

Plaintiffs claim that once it is established that the insured has an insurable interest, the insured is entitled to the full amount set forth under the insurance policy. Stated another way, plaintiffs argue that the notion of insurable interest is "binary": "[y]ou either have an interest or [you don't]." ECF No. 55-1 at 9 (quoting ECF No. 55-8 at 2).

XL Insurance responds that insurable interest is not a binary concept, and an insured can be limited to recovering only the amount that they have invested in a property. In support, XL Insurance cites Belton v. Cincinnati Insurance Co., 602 S.E.2d 389 (S.C. 2004). In Belton, the South Carolina Supreme Court defined "a party's insurable interest in property" as equivalent to its "personal stakes in that property." Id. at 392. Accordingly, the court held that a lease containing an option to purchase property did not create an insurable interest for the option-holder where he did not otherwise have any equity or personal stake in the property. Id. But as established above, XL Insurance is past the point of arguing that Metanoia possesses no insurable interest at all. Instead, XL Insurance focuses on a passage in Belton where the court explained that "an insured may not recover insurance proceeds in excess of his interest in the property." ECF No. 60 at 5–6 (quoting id.). Seizing on that phrase, XL Insurance claims that Metanoia is limited to recovering what it has actually invested into Old Chicora.

But <u>Belton</u> does not answer the question of whether an insured can recover less than a full interest.  By specifying that a party's insurable interest must reflect his personal stake in property, the South Carolina Supreme Court only sought to determine whether the plaintiff had an insurable interest in the first place.  See <u>Belton</u>, 602 S.E.2d at 392.  Since the court in <u>Belton</u> determined that the plaintiff did not have any equity in the property, it determined that coverage was properly denied.  <u>Id.</u>  As such, the court in <u>Belton</u> did not have an occasion to address how much coverage the plaintiff would have been entitled to if he were, in fact, insured.  Here, there is no dispute that Metanoia had an insurable interest.  Therefore, XL Insurance has already conceded that Metanoia had at least some personal stake in the property.

The other cases cited by XL Insurance are similarly inconclusive.  In a case that the South Carolina Supreme Court relied upon in <u>Belton</u>, the court explained that "[u]nder South Carolina law, a party is not entitled to receive insurance proceeds in excess of their interest in the property."  <u>Singletary v. Aetna Cas. & Sur. Co.</u>, 447 S.E.2d 869, 870 (S.C. Ct. App. 1994) (citing <u>Swearingen v. Hartford Ins. Co.</u>, 52 S.C. 309, 29 S.E. 722, 723 (1898))).  But in <u>Singletary</u>, the central issue was whether an assignee to a policy, standing in the shoes of his assignor, could recover under the policy where the assignor could not.  The court reversed the circuit court's judgment that the plaintiff had an insurable interest, reasoning that the assignee could not recover any more than what the assignor was permitted to recover.  <u>Id.</u>  Once again, then, the court did <u>not</u> address the rights of the insured in a case where he already possesses an insurable interest.

Indeed, this court has not identified any South Carolina cases that explicitly found that where a party had an insurable interest, such interest could be valued at an amount

below the coverage amount.  Rather, one case from South Carolina proposed the opposite, explaining that "an insured may recover the full value insured even though he has a limited interest worth less than the amount of the insurance."  Hunt v. Gen. Ins. Co. of Am., 87 S.E.2d 34, 37 (S.C. 1955) (citations omitted).  Although the opinion is somewhat dated, Hunt nevertheless remains good law, and no other case has directly contravened it.  In Hunt, the policy at issue involved a building that was conveyed by Belle Hunt ("Belle") to the plaintiffs, Timothy Hunt and Jeanne Hunt Burley, for the lifetime of Belle.  Id. at 35.  The defendant issued an insurance policy to the plaintiffs with the knowledge that they did not own the building, as it was owned in fee by Belle, subject to a life estate.  Id.  Following a building fire, the defendant took the position that the plaintiffs' recovery for the loss should be calculated "on the basis of their proportionate interest in the full property" or else "they would reap a profit on their insurance over and above actual indemnity."  Id. at 36.  The lower court rejected the argument, noting that if anything, public policy militated finding for the plaintiffs because otherwise, the insurer would benefit from "over-insuring the interest of an insured and unjustly enrich itself by collecting full premiums . . . without any offer to return [the] same for which it recognizes."  Id.  The South Carolina Supreme Court affirmed and fully adopted the lower court's reasoning.  Id.

To be sure, Hunt is not the perfect precedent either.  In Hunt, the court emphasized that the insurer "was well aware" of the plaintiffs' partial interest in the property.  Id.  The defendant had in fact been the one to issue a separate policy to Belle, the owner of the property.  Here, the issue of whether XL Insurance had complete knowledge of Metanoia's interest in the Old Chicora property is greatly contested.  XL

Insurance claims that at the time it issued the Policy, it believed, wrongly, that Metanoia had already purchased Old Chicora. Additionally, in <u>Hunt</u>, the court relied on S.C. Code Ann. § 38-75-20, also known as the Valued Policy Statute, to reach its decision. Neither party has raised the applicability of that statute here.

Despite those distinguishing features, the court finds that <u>Hunt</u> is persuasive and requires the court to deny XL Insurance's motion for summary judgment on plaintiffs' breach of contract claim. Although XL Insurance argues that it was misled about Metanoia's interest in the Old Chicora property, it did not raise the issue in the context of Metanoia's insurable interest. Therefore, the court has no way of evaluating whether or to what degree an awareness of Metanoia's status as a nonowner would have affected XL Insurance's willingness to issue full coverage on the face of the Policy.

At the same time, the court finds that summary judgment is also unwarranted in plaintiffs' favor. <u>Hunt</u> is distinguishable and does not fully support plaintiffs' position. Moreover, the court is cognizant that the parties may be able to find additional legal and evidentiary support for their positions based on the uncertainty raised in this order. Given that this case is proceeding to a bench trial, the court finds that it would not prejudice the parties to fully reserve the issue for trial. See <u>Greenwich Ins. Co. v. Garrell</u>, 2013 WL 869602, at *11 (D.S.C. Mar. 7, 2013) (denying motion for summary judgment without prejudice and explaining that since the case was proceeding to a bench trial, the court would reserve ruling on the issue of whether certain insurance policy exclusions barred coverage and allow the parties to reraise the issues at trial).

Finally, XL Insurance argues that even if the court deems South Carolina's law to be ambiguous on the issue of limited insurable interests, the Policy here expressly states

that a claim will be valued "for no more than the interest of the 'Insured.'"  ECF No. 56-3 at 35; see also ECF No. 56-3 at 12 (stating that additional insureds will only be covered to the extent "as their respective interests may appear").  According to XL Insurance, such language dictates that each insured cannot recover an amount that exceeds its interest in the property without violating those provisions.  The court finds that this Policy language fails to move the needle.  If the court were to ultimately determine that by law, Metanoia's insurable interest requires XL Insurance to pay the full coverage, the Policy language would be entirely consistent with that finding.  In that scenario, Metanoia's "interest" would consist of the entire coverage, and the Policy provision would simply be reiterating that an insurance claim cannot be valued for any more than what the Policy already provides.  Accordingly, the court denies summary judgment on both parties' motions and finds that the issue of whether an insurable interest may be limited is best reserved for trial.

### b.  Value of the Insurable Interest

Next, plaintiffs argue that XL Insurance could not explain how it unilaterally decided to limit Metanoia's amount of recovery and that XL Insurance's witnesses could not produce a basis for the "some level" determination.  ECF No. 55-1 at 5–7.  Plaintiffs also argue that to the extent the court ultimately finds that Metanoia may possess some level of insurable interest, "Metanoia's insurable interest is far greater than the amount unilaterally determined by XL" and that issue should be reserved for trial.

On the issue of whether XL Insurance substantiated its determination of Metanoia's level of interest, the court finds that while the evidence weighs in XL Insurance's favor, a finding on the issue does not resolve the pending motions.  Once XL

Insurance determined that Metanoia did not have a fully-insurable interest, that decision—whether fair or not—was communicated to Metanoia on multiple occasions. On April 16, 2020, XL Insurance first indicated that it was operating under the assumption that Metanoia did not have a full interest as it was "not the property owner." ECF No. 55-3 at 2.  On August 7, 2020, Engle Martin sent a letter to Metanoia indicating it had determined that Metanoia's interest was calculated based on information it provided "about expenses it has incurred."  ECF No. 56-20 at 3.  On December 2, 2020, XL Insurance confirmed that Metanoia's interest was "limited to the amount spent by Metanoia in planning and preparing to renovate the building."  ECF No. 56-24 at 3.

But if the court were to ultimately find that the "some level" determination was improper to begin with, the issue of whether Metanoia could explain its supposedly "unilateral determination" becomes irrelevant.  See ECF No. 55-1 at 5.  In other words, before the court can turn to whether XL Insurance was able to adequately explain its decision to calculate Metanoia's interest based on its expenditures, the court must decide whether XL Insurance's "some level" determination was correct in the first place. Assuming, without deciding, that Metanoia can recover partial coverage for the building, the court finds that XL Insurance adequately explained their position.

Contemplating that potential finding, plaintiffs shift gears to argue that even if XL Insurance was somehow correct in in its "some level" determination, Metanoia's insurable interest goes beyond the amount it spent on the building before the fire. Specifically, Metanoia contends that it possessed equitable title in the property, and an insurable interest may arise out of equity.  In response, XL Insurance argues that Metanoia is mistaken because an insurable interest is not coterminous with property

rights.  By way of example, XL Insurance points out that even though Trident Construction is a named insured, plaintiffs naturally do not contend that Trident Construction is entitled to full coverage for the replacement costs.

Again, the court has not resolved the issue of whether an insurable interest may be limited.  But even if it were to find that an insured may possess "some level" of insurable interest, the court agrees with plaintiffs that a genuine dispute of material fact exists as to whether Metanoia's insurable interest rose to a higher "level."  As a court in this district has observed, Belton and other South Carolina cases "do not provide much specific guidance" on what an insurable interest requires beyond "the general receive a benefit or suffer a loss language."  Haynes v. Auto-Owners Ins. Co., 2013 WL 4027762, at *3 (D.S.C. Aug. 6, 2013) (collecting cases).  "As a result, the existence of an insurable interest after conveyance is necessarily a fact-specific inquiry."  Id.; see also id. at *4 (explaining, after finding that the plaintiff had "sort of equitable interest," that "[t]he extent of that equitable interest is an issue of fact for a jury").

As a fact-specific inquiry, the dispute is better reserved for trial.  Here, Metanoia's equitable interest may arguably be measured by the cash contributions, pledges, and tax credit equity that it received in preparation for the Project.  Although the cash contributions and pledges were not insured by the Policy, a reasonable factfinder could determine that they effectively gave Metanoia a full personal stake in the building. Additionally, Metanoia presents evidence that the City had begun effectively treating Metanoia as the equitable owner.  In a letter signed by the Mayor of North Charleston, Keith Summey, ("Mayor Summey"), XL Insurance was told that the City had "granted Metanoia all of the City's interest, complete control, site control and occupation of the

16

property" through agreements between the two and through City Council resolutions.
ECF No. 55-15 at 2. Mayor Summey confirmed at his deposition that he believed
Metanoia "had complete control." ECF No. 56-37, Summey Dep. at 48:25. XL
Insurance responds that the letter from Mayor Summey was drafted by Metanoia's
counsel. ECF No. 56-1 at 9. To the extent XL Insurance questions the authenticity or
validity of the letter, that issue is better reserved for trial.

 As for XL Insurance's argument that the Policy contemplates different levels of
insurable interests for different stakeholders, such as contractors and subcontractors,
plaintiffs have presented a genuine dispute that Metanoia was effectively the owner as
contemplated by the Policy. The Policy states, under Endorsement #7, that it "is
extended to cover damage to existing real property of the Project Owner at the insured
location." ECF No. 56-3 at 51. Notably, the term "Project Owner" is not defined in the
Policy, but XL Insurance is precluded from arguing that the term could refer to the City,
by virtue of its contention that the City is absent from the Policy. The Policy is a
builders' risk insurance policy that covers up to $8.4 million in damages to a building. If
not Metanoia, it is virtually impossible that XL Insurance would ever pay out the full
coverage to any of the insureds, based on XL Insurance's interpretation of the Policy.
Accordingly, there is a genuine dispute that "Project Owner" could only refer to
Metanoia, bolstering plaintiffs' position that its insurable interest rises to the full level of
the amount covered under the Policy.

 In sum, the court finds that there is a genuine dispute of material fact as to
whether Metanoia may be subject to a <u>limited</u> insurable interest. The court also finds that
determining the amount or level of Metanoia's insurable interest is premature, and such

an issue is more appropriate for trial.  Accordingly, the court denies both parties' motions for summary judgment.

### 2.  The City as an Additional Insured

In the alternative to arguing that Metanoia has a fully-insurable interest, plaintiffs argue that even if Metanoia were not entitled to full coverage, the City would then be able step in to recover the remaining coverage.  Plaintiffs maintain that the City would be entitled to do so because it was contemplated as an "additional insured" under the Policy. In arguing that Metanoia does not have a fully-insurable interest because it did not own the property or have a written lease, XL Insurance effectively concedes that if the City is named in the Policy, it—as the owner—is entitled to coverage.  XL Insurance argues instead that the City was not an additional insured under the Policy.

To resolve the issue of whether the City is an additional insured, both parties primarily appeal to the language of the Policy.  "An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)).  "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." Id. (citing Schulmeyer, 579 S.E.2d at 134).  However, an insurance contract which is "in any

respect ambiguous or capable of two meanings" must be construed strictly against its

drafter, the insurer.  Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968).

Here, the Policy provision at issue states:

> To the extent required by contract for the "Insured Project" and then only as their respective interests may appear, owners, contractors, subcontractors and other individual(s) or entity(ies) specified in such contract shall be recognized as Additional Insured's hereunder, but limited only to their activities at the "Project Location" (herein Additional Insured(s)).

ECF No. 56-3 at 12 (emphases added).  In support of their claim that the City is an

additional insured, plaintiffs note that the list of potential additional insured entities

includes "owners."  There is no dispute that on the day of the fire, the City held legal title

to the Old Chicora building, thus was its "owner."

XL Insurance instead focuses on the prefatory clause in the provision, which

qualifies the list as "To the extent required by contract for the 'Insured Project . . . .'"  XL

Insurance argues that the "contract for the 'Insured Project'" should most directly be read

as referring to the construction contract[5] between Metanoia and Trident Construction.

See ECF No. 60-2.  The construction contract defined the term "Owner" as Metanoia.  Id.

at 2.  Relying on the rest of the provision's language, XL Insurance explains that the City

was thus not "specified in such contract," and the City's interests and activities were not

required by contract.  ECF No. 60 at 15.

In contrast, plaintiffs argue that the prefatory clause may be broadly read to

include an unwritten contract between Metanoia and the City in which the City granted

Metanoia permission to begin early demolition work on the building due to the

---

[5] XL Insurance attaches a redlined version of the construction contract.  ECF No. 60-2.  Plaintiffs do not dispute the authenticity of the document, so the court presumes the contract was effective as written.

complexity of the Project.  According to plaintiffs, the demolition agreement establishes

that the City is an "owner."  Plaintiffs present evidence that this unwritten agreement was

later memorialized in a letter issued by the Office of Mayor Summey on November 18,

2019 (which the parties sometimes refer to as the "demo memo").  ECF No. 55-12.

Notably, the demo memo was created after the Policy's inception but before the date of

the fire.[6]  Id.

      As a matter of contract interpretation, the court finds that there is a genuine

dispute of material fact as to whether the "contract for the 'Insured Project'" may be read

to include the City and Metanoia's unwritten contract.  The phrase "Insured Project" is a

defined term in the Policy, referring to "[t]he project undergoing construction or

renovation as described in the DECLARATIONS section of this policy."  ECF No. 56-3

at 38.  That definition does not rule out the possibility that the City and Metanoia's

contract qualifies.  The City and Metanoia apparently agreed that Metanoia would be

permitted to begin demolition work on the property, which arguably falls within the

confines of the "Insured Project."  Although there is scant evidence of the initial

agreement, the "demo memo" confirms the existence of some sort of agreement.  See

---

[6] XL Insurance argues that plaintiffs previously alleged in their complaint and
amended complaint that the City should be recognized as an additional insured based on
the construction contract between Metanoia and Trident Construction.  See, e.g., Amend.
Compl. ¶ 46 ("[T]he Trident/Metanoia contract requires the owner to be a named insured
for builder's risk.").  According to XL Insurance, plaintiffs recently changed their
position to argue that the term "contract" may also refer to the demo memo.  However, "a
plaintiff does not have to allege in his complaint every fact on which he will rely at
summary judgment."  Faulconer v. Centra Health, Inc., 808 F. App'x 148, 154 (4th Cir.
2020) (citation omitted).  Importantly, the court finds that even though plaintiffs did not
allege that the demolition agreement was the source of the City's interest in the Policy,
plaintiffs' reliance on the agreement at this stage does not present "an entirely different
theory" or a "wholesale change" such that XL Insurance would be unfairly prejudiced.
See id.

ECF No. 55-12.  Naturally, XL Insurance takes umbrage with the idea that the Policy could somehow be referring to the unwritten demolition agreement.  But as plaintiffs point out, nothing in the Policy provision states that a <u>written</u> contract must supply the terms for an additional insured.  As such, the court finds that the provision at issue here is subject to more than one interpretation, meaning summary judgment would not be proper. <u>See</u> <u>Wash. Metro. Area Transit Auth. v. Potomac Invest. Props., Inc.</u>, 476 F.3d 231, 235 (4th Cir. 2007) ("Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations."); <u>Trs. of Ironworkers Local Union No. 16 Pension Plan v. Bryant Concrete Constr., Inc.</u>, 2020 WL 134575, at *6 (D. Md. Jan. 10, 2020) ("[A] contractual ambiguity may give rise to a genuine dispute of material fact that precludes summary judgment.") (citation omitted).

Both parties further present extrinsic evidence in the event that the court finds that the Policy language is ambiguous.  "Even where a court . . . determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis."  <u>Wash. Metro.</u>, 476 F.3d at 235.  Based on the extrinsic evidence, however, the court continues to find that the evidence leaves genuine issues of fact regarding the contract's proper interpretation.

Plaintiffs' most compelling evidence consists of communications between the City and Metanoia in which the parties clearly indicated their intent to include the City as an additional insured.  This intent was reflected in both emails between the parties and in

the demo memo, which included a stipulation that the City be listed as an additional

insured on the builder's risk policy.  See ECF No. 59-12 at 2; ECF No. 55-12.  But

plaintiffs face a roadblock to summary judgment in their favor because there is no direct

evidence whatsoever that such an intent was passed on to XL Insurance.[7]  Therefore, the

evidence provides only some support for the claim that the parties, along with the

insuring broker, intended to include the City in the Policy.

As additional evidence, plaintiffs also note that as early as March 27, 2020,

Metanoia's public adjuster sent XL Insurance information putting it on notice that

Metanoia believed the City, as an additional insured, had an insurable interest in the

property.  See ECF No. 55-13 at 3.  Plaintiffs note that XL Insurance, conversely, never

raised the issue of whether the City was an additional insured and failed to investigate the

issue during the claims investigation.  This evidence, however, simply speaks to the good

faith efforts of the City (or lack thereof), and not whether the City was, in fact, an

additional insured.

On the other hand, XL Insurance directs the court to the fact that after the fire,

USI—acting on behalf of Metanoia—contacted XL Insurance to ask that the Policy be

endorsed to add the City as an additional insured.  ECF No. 60-4.  XL argues that if the

City qualified as an additional insured under the existing terms of the Policy, there would

---

[7] "Under South Carolina law, a contract is formed between two parties when there is, inter alia, 'a mutual manifestation of assent to [its] terms.'"  Berkeley Cnty. Sch. Dist. v. Hub. Int'l Ltd., 944, F.3d 225, 236 (4th Cir. 2019) (quoting Edens v. Laurel Hill, Inc., 762 S.E.2d 696, 701 (S.C. 2014)); see also Stevens & Wilkinson of S.C., Inc. v. City of Columbia, 762 S.E.2d 696, 701 (S.C. 2014) ("A valid and enforceable contract requires a meeting of the minds between the parties with regard to all essential and material terms of the agreement.") (emphasis in original).  The matter of who is insured is surely a material term in an insurance contract.

have been no need for Metanoia to request that the terms of the Policy be changed to add the City as an additional insured. Additionally, the City did not submit a claim under the Policy until May 2022—more than two years after the fire. The court similarly finds, as it did for plaintiffs, that XL Insurance's argument has some merit but also fails to move the needle. Although plaintiffs belatedly requested an amendment, such an action could be seen as a precautionary measure more than anything else, and the City was certainly not <u>required</u> to file an independent claim in the first place given that Metanoia already filed a claim. The court finds that both parties' evidence, in the aggregate, does not alter the court's conclusion that the Policy's "additional insured" provision is ambiguous, and the court reserves its ruling on the issue for trial.

### 3. Replacement Cost Coverage

Finally, XL Insurance argues that XL Insurance did not breach the contract because it paid Metanoia all that it was required to under the Policy. XL Insurance ultimately agreed to pay Metanoia $1.235 million, which represented the ACV of the building, as determined by XL Insurance's independent appraisers, less the policy deductible. Through this action, Metanoia is seeking over $7 million in repair costs, but XL Insurance argues that under the terms of the Policy, Metanoia is not entitled to replacement cost value ("RCV") unless and until it has actually repaired or replaced the damaged property.

The court agrees that as purely a contractual matter, there can be no genuine dispute that the Policy clearly establishes that recovery based on RCV must be based on actual replacements. But the court finds that there is a genuine dispute as to whether XL Insurance truly invoked the provision. If XL Insurance invoked the "actual-repair"

provision, one could reasonably infer that XL Insurance would have paid the coverage for whatever repairs were made. But if XL relied on the fact that Metanoia could never claim full coverage based on its limited interest, XL Insurance arguably did not invoke the actual-repair provision, and it may not be able to rely upon it now for purposes of opposing plaintiffs' breach of contract claim.

The court first turns to whether the Policy, on its face, limits recovery based on replacement cost to the value of completed repairs. To resolve this issue, the court again turns to the language of the insurance policy. The provision at issue is found in Endorsement #7 to the policy and states:

> (iv)    The following basis of valuation shall apply at the time and place of loss:
>
> > (1)    Replacement Cost: If actually replaced, the cost to repair or replace the property lost or damaged with materials of like kind and quality excluding betterments.
> > (2)    "Actual Cash Value": If not replaced we will pay the "Actual Cash Value".

ECF No. 56-3 at 51.

The court agrees that the language of Endorsement #7 clearly and unambiguously states that if replacements are not made, XL Insurance is required to pay the ACV, as opposed to the RCV. XL Insurance's position is further bolstered by at least two federal court cases that have analyzed South Carolina law. See Hicklin v. State Farm Fire & Casualty Co., 2020 WL 1244631, at *8 (D.S.C. Mar. 13, 2020); Collins Holding Corp. v. Wausau Underwriters Insurance Co., 204 F. App'x 208, 210 (4th Cir. 2006). Both cases involved policies that contained provisions that were similar to the one found in the

Policy here.[8]  In both cases, the court held that based on the provision, the insured could not recover replacement cost value in advance of making the repairs.  E.g., Hicklin, 2020 WL 1244631, at *8 (finding that the provision was "plain and unambiguous" and holding that the insurer was entitled to judgment as a matter of law on the plaintiffs' breach of contract claim).

Furthermore, another one of the Policy's provisions supports XL Insurance's position that it did not breach the contract.  The Policy also contains provisions that limit payable losses to damages that are repaired within two years.  One such provision states that the valuation of the claim shall be based on "The lesser of the cost to repair or replace Permanent Works at the same site and within two (2) years from the date of damage . . . . Otherwise the loss shall be settled on an 'Actual Cash Value' basis."  ECF No. 56-3 at 35.  In Hicklin, the policy at issue also contained a similar provision.[9]  Since the plaintiffs did not complete the repair or replacement of the damaged building within two years of the date of loss, the court determined that judgment was warranted in the insurance company's favor on this basis as well.

Plaintiffs attempt to distinguish Hicklin by arguing that the language in the Policy is ambiguous given that the provision at issue here is found in the "Valuation" section of

---

[8] In Hicklin, the provision at issue stated that "[u]ntil actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the building."  2020 WL 1244631, at *8.  In Collins, the relevant portion stated that the insurer would "not pay on a replacement cost basis for any loss or damage: (1) Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." 204 F. App'x at 210.

[9] The policy stated, "To receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the building within two years after the date of the loss . . . ."  Hicklin, 2020 WL 1244631, at *4.

the Policy, and not, for example, under the "Event of a Loss" section.  ECF No. 59 at 18.

According to plaintiffs, the provision is "ambiguous or conflicting" because it does not

specify that repairs <u>must</u> be completed in two years.  ECF No. 59 at 18.  Plaintiffs

suggested at the hearing that one reasonable interpretation of the provision is that the cost

of materials and labor for the repairs must be measured at their value no more than two

years after the date of loss.  The court is unconvinced.  Although the provision is found in

the valuation section, the provision speaks for itself and unambiguously provides that the

loss may be settled using the ACV if repairs were not made within two years.

Additionally, the Policy's "Extensions of Coverage" section further provides:

> The Company shall not be liable for any loss unless the damaged or
> destroyed building(s) or structure(s) is actually rebuilt or replaced and
> unless the repairs or replacement are made as soon as reasonably possible
> after the loss, not to exceed two (2) years.

ECF No. 56-3 at 27.  At minimum, this additional provision is consistent with the two-

year provision found in the "Valuation" section.  As a result of both Endorsement #7's

ACV provision and the two-year provision, the court finds that the Policy allowed XL

Insurance to determine that Metanoia would be limited to recovery based on the ACV.

Even so, the court finds that a genuine dispute of material fact remains as to

whether XL Insurance breached the contract.  Specifically, the court finds that there is a

genuine question of whether XL Insurance impliedly waived the provisions discussed

above by asserting that plaintiffs did not have a full level of insurable interest.  The court

extricates this argument from plaintiffs' position that "XL Insurance unreasonably and

completely deprived Plaintiffs of the RCV component of the policy by unilaterally taking

the position that Metanoia only had 'some level' of insurable interest."  ECF No. 59 at

12.  In other words, plaintiffs suggest that based on Metanoia's reliance on XL

Insurance's "some insured" conclusion, it would have been irresponsible for Metanoia to begin repairs when its insurer insisted that it lacked coverage—i.e., it would be a risky investment of money to make repairs without certain knowledge that such repairs would be covered at their RCV, since XL Insurance contested that Metanoia was fully insured. As such, plaintiffs essentially contend that the availability of RCV under the Policy was never in play and had been waived by the insurer.

"A waiver is an intentional relinquishment of a known right." Lyles v. BMI, Inc., 355 S.E.2d 282, 285 (S.C. Ct. App. 1987). "An implied waiver results from acts and conduct of the party against whom the doctrine is invoked from which an intentional relinquishment of a right is reasonably inferable." Id. While waiver is often applied when a plaintiff waives his or her right to enforce a contract, the principle can also apply where an insurer-defendant waives a provision that was written into the policy for the company's own benefit. See Wright v. New England Mut. Life Ins. Co. of Bos., 163 S.E. 133, 136 (S.C. 1932) (finding that an insurer had waived enforcement of a policy provision requiring payment of the initial premium at the time that the application was made); see also Williams v. Phila. Life Ins. Co., 100 S.E. 157, 160 (S.C. 1919) ("If the company, who had a right under the contract, . . . shall make any speech or perform any act from which a reasonable inference may be drawn that the company does not stand upon its right, then waiver may be inferred."). "Waiver is a question of fact for the finder of fact." Parker v. Parker, 443 S.E.2d 388, 391 (S.C. 1994).

To be sure, XL Insurance stated, on multiple occasions, that nothing in its coverage letters was intended to be a waiver of its rights or defenses. E.g., ECF No. 55-3 at 3 ("XL Insurance America reserves all rights and defenses under the policy and

applicable law.  In particular, XL Insurance America reserves the right to supplement or amend its evaluation of coverage and potential coverage issues . . . .").  But a reasonable factfinder could conclude that this was boilerplate legalese, particularly as XL Insurance continued to mention Metanoia's limited interest through the end of its investigation.  See, e.g., ECF No. 55-4 at 3.  As a practical matter, by taking the simultaneous position that Metanoia could not recover the full value of coverage, a reasonable factfinder could determine that Metanoia was effectively precluded from beginning repairs, even if it wanted to, in reliance on XL Insurance's statement.  In other words, if XL Insurance intended to enforce its "some level" determination—and all the evidence indicates that it did—Metanoia might have been limited in its ability to recover for the repairs even if it had undertaken them.

Based on this bind, the court finds that there is a genuine dispute of material fact as to whether XL Insurance's reliance on both avenues for limiting coverage meant it impliedly waived one or the other.  Even though the court agrees that the terms of the Policy are clear enough, plaintiffs will be permitted to assert that they were limited in their ability to adhere to the terms of the Policy.  Thus, summary judgment is not warranted in either party's favor on plaintiffs' breach of contract claim.[10]

---

[10] For the same reasons discussed in this section, the court denies summary judgment on plaintiffs' declaratory judgment cause of action.  This means the court reserves for trial the following issues in which plaintiffs requested declaratory relief: (1) whether Metanoia is still "in the loss" without a final determination of its claim, (2) whether the City is an insured, and (3) whether the Policy provides plaintiffs the right to recover based on RCV, which XL Insurance denied.  Amend. Compl. ¶ 66.

### B. Reformation

Additionally, XL Insurance argues that summary judgment is warranted in its favor on Metanoia's request to reform the Policy to formally include the City as an additional insured. The court determined above that there is a genuine dispute about whether the City is already included in the Policy as an additional insured. However, the court finds that the issue of whether the Policy may be reformed is capable of being resolved at this stage, and summary judgment is warranted. As the legal import, if the court were to ultimately find that the City is not an additional insured <u>as written</u>, plaintiffs will not be able to then reform the Policy to add the City.

Plaintiffs allege that reformation should be permitted due to a mutual or unilateral mistake. Amend. Compl. ¶ 72. "Reformation is the remedy by which writings are rectified to conform to the actual agreement of the parties." <u>Crewe v. Blackmon</u>, 345 S.E.2d 754, 757 (S.C. Ct. App. 1986). "[It] is available on the ground of mistake or misunderstanding as well as duress and related misconduct." <u>Id.</u> Where the party seeking reformation claims mistake, a court may reform a contract when the mistake was mutual or unilateral. <u>Shaw v. Aetna Cas. & Sur. Ins. Co.</u>, 262 S.E.2d 903, 905 (S.C. 1980). "A mistake is mutual where both parties intended a certain thing and by mistake in the drafting did not obtain what was intended." <u>George v. Empire Fire & Marine Ins. Co.</u>, 545 S.E.2d 500, 504 (S.C. 2001). Here, there is no evidence that plaintiffs and XL Insurance <u>mutually</u> intended to include the City as an additional insured but left the City out due to a misunderstanding. Rather, the evidence is clear that XL Insurance was not aware of any intent to include the City, <u>see</u> ECF No. 56-40, Williams Dep. at 91:22–92:6,

even if Metanoia and the City did have their own internal discussions about the City's desire to be included, ECF No. 56-6.

In contrast to reformation for a mutual mistake, reformation for a unilateral mistake is appropriate when the mistake "has been induced by the fraud, deceit, misrepresentation, concealment, or imposition in any form of the party opposed in interest to the reformation or rescission, without negligence on the part of the party claiming the right" or when the mistake is "is accompanied by very strong and extraordinary circumstances, showing imbecility or something which would make it a great wrong to enforce the agreement, sustained by competent testimony of the clearest kind." Shaw, 262 S.E.2d at 905.

Plaintiffs concede that there is no evidence that XL Insurance engaged in "fraud, deceit, misrepresentation, or concealment." ECF No. 59 at 26. In their response to XL Insurance's motion for summary judgment, plaintiffs argued that unilateral mistake occurred due to imbecility, which they define as "more of less synonymous with mental illness" or "unsoundness of mind." ECF No. 59 at 27 (citing Black's Law Dictionary and The Law Dictionary definitions). Plaintiffs appeared to concede this argument at the hearing.

Instead, plaintiffs argue that it would simply be "a great wrong to enforce the agreement as written" because XL Insurance's responsibilities should not have changed based on who legally owned the property. ECF No. 59 at 27. But plaintiffs' position is simply unsupported by the law. "Reformation of a contract is an extraordinary equitable remedy and should be granted with great caution and only in clear cases of fraud or mistake." Hartford Fire Ins. Co. v. Med. Soc'y of S.C., 2021 WL 2457667, at *2 (D.S.C.

June 15, 2021) (quoting 66 Am. Jur. 2d Reformation of Instruments § 1 (2011)).  In the absence of those hallmarks, reformation is not warranted, and the court grants summary judgment on plaintiffs' cause of action for reformation.

To be clear, the court's finding on reformation does not preclude the court from finding that the City is a named additional insured.  In granting summary judgment on this cause of action, the court finds that plaintiffs cannot ask it to modify the Policy to include the City as an additional insured.  However, should the court determine at trial that the City was implicitly named in the Policy, the bar against reformation would not prohibit the City from recovering.

### C. Bad Faith

Finally, XL Insurance argues that summary judgment is warranted in its favor on plaintiffs' bad faith claim.  The elements of bad faith refusal to pay are: "(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured."  Crossley v. State Farm Bureau Cas. Ins. Co., 415 S.E.2d 393, 396–97 (S.C. 1992) (citation omitted).  "If there is a reasonable ground for contesting a claim, there is no bad faith."  Id. at 397.  Courts have further specified that an insurer has on objectively reasonable ground when that insurer "clearly did not improperly contest coverage, nor did [it] act in willful, wanton, or reckless disregard of [the insured's] rights under the Policy."  Shiftlet v. Allstate Ins. Co., 451 F. Supp. 2d 763, 770 (D.S.C. 2006).  Summary judgment is warranted where the insurer can prove that its actions were reasonable based "on all the

evidence available in the case." Snyder v. State Farm Mut. Auto Ins. Co., 586 F. Supp. 2d 453, 460 (D.S.C. 2008). But "[w]hen conflicting evidence is presented, summary judgment on the issue of bad faith is generally inappropriate." Id. (citation omitted).

XL Insurance argues that they had reasonable bases for both their determinations: (1) that in the absence of any incurred repair costs, XL Insurance correctly paid Metanoia the ACV, and (2) that Metanoia was limited to recovery based on its insurable interest. But even if the court had found as a matter of law that XL Insurance did not breach the Policy—and the court did not—plaintiffs' bad faith claims may still survive. "[T]he covenant of good faith and fair dealing extends not just to the payment of a legitimate claim, but also to the manner in which it is processed." Mixson, Inc. v. Am. Loyalty Ins. Co., 562 S.E.2d 659, 662 (S.C. Ct. App. 2002) (citing Tadlock Painting Co. v. Md. Cas. Co., 473 S.E.2d 52, 52 (S.C. 1996)). "[I]f an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action." Tadlock, 473 S.E.2d at 53 (quoting Nichols v. State Farm Mut. Auto Ins. Co., 306 S.E.2d 616, 619 (S.C. 1983)) (emphasis in original). Thus, breach of contract is not a prerequisite to bringing a bad faith cause of action.

In response to XL Insurance's motion for summary judgment, plaintiffs present evidence of XL Insurance's alleged bad faith in both denying the claim and in investigating the claim. First, as a matter of XL Insurance's coverage decision, plaintiffs argue that XL Insurance made "bad faith decisions" that allowed them "to cut off RCV" from plaintiffs. ECF No. 59 at 12. Specifically, plaintiffs argue that XL Insurance contravened standard procedure by failing to provide Metanoia with "RCV process." Id.

at 18.  In support, plaintiffs cite <u>Hicklin</u> and <u>Collins</u>, the same two cases that XL

Insurance cited when arguing that it properly decided to pay Metanoia ACV.  Plaintiffs

claim that in those cases, the insurance companies had at least "provided the insured with

the RCV process" by committing to pay an RCV amount to them, and in the case of

<u>Collins</u>, engaged in negotiations regarding the RCV.  ECF No. 59 at 24.  According to

plaintiffs, the insureds in those cases had the option of making the repairs because they

had a guarantee in place; here, plaintiffs allege, XL Insurance did not even attempt to

determine the RCV amount alongside the plaintiffs during the claims process.  The court

finds that the alleged lack of a discussion about an RCV amount, while not direct

evidence of breach,[11] could be construed as evidence of bad faith.  A reasonable

factfinder could conclude that reasonable insurers in XL Insurance's shoes must engage

with the insured about the RCV amount and that XL Insurance failed to do so.[12]

Similarly, plaintiffs contend that even though XL Insurance unilaterally

determined that Metanoia was not entitled to the RCV, it began the process of conducting

an estimate of the total cost for the repairs without notifying Metanoia of the results.  XL

Insurance's estimator, Young & Associates, allegedly concluded that Old Chicora would

cost $4,614,823 to repair.  ECF No. 59-29.  Plaintiffs assert that after receiving the

---

[11] Plaintiffs raised this argument in the context of their breach of contract claim; however, the court finds that the argument is better raised in the context of bad faith.  In both <u>Hicklin</u> and <u>Collins</u>, the insurers were not obligated to pay RCV benefits because the policy language did not require them to do so; whether they worked with the insureds to make preliminary determinations about the RCV had no bearing on that issue.

[12] Plaintiffs also argue at various points in their briefs that XL Insurance acted in bad faith regarding its coverage decision because (1) it failed to seek specific documents from Metanoia, (2) it did not reveal that it would limit Metanoia to its level of insurable interest until December 2020, and (3) it cancelled the Policy in bad faith.  XL Insurance presents documents to oppose all three claims, but since the court has already determined that summary judgment is unwarranted, the court reserves these factual disputes for trial.

estimate from Young & Associates, XL Insurance deliberately decided to withhold the figures from Metanoia's public adjuster and estimator. ECF No. 59 at 13 (citing ECF No. 59-30, Lemming Dep. at 30:23–32:16). Dennis Lemming, Metanoia's estimator, testified that he did not receive Young & Associates' figures until May 2022, after they were obtained through discovery. Lemming Dep. at 32:2–5. XL Insurance vehemently disputes this, arguing that the sheet in question was a "working file" created by an estimator at Young & Associates. ECF No. 62 at 7. XL Insurance claims that the sheet was <u>not</u> intended to be an "estimate" because it was based on a lot of different variables and "multiple possible approaches to the repairs." <u>Id.</u> Young & Associates produced the working file in response to a subpoena, but XL Insurance claims it was not intended to be shared. Certainly, there is an avenue for XL Insurance to succeed in proving that the actions of it and its estimator were reasonable. But the court finds that the evidence could lead a reasonable factfinder to conclude that XL Insurance acted in bad faith.

Next, plaintiffs present evidence that XL Insurance engaged in bad faith during the claims investigation process. For example, plaintiffs note that Engle Martin drafted and sent letters dated February 19 and 24, 2020 to Trident Construction and Metanoia stating that XL Insurance would be fully denying coverage. ECF No. 59-16 at 9–16. Internal emails revealed that XL Insurance later instructed Engle Martin not to send the denial letter. <u>Id.</u> at 18–19. Since Engle Martin had already sent the letter, it attempted to "intercept" the letter to the insureds. <u>Id.</u> at 22. The draft denial letters attempted to substantiate the decision by explaining XL Insurance's belief that Metanoia was not an owner or written lessee of the property. <u>E.g.</u>, <u>id.</u> at 15. But the letters were intended to be sent less than a month after the fire, and before XL Insurance had an opportunity to

conduct a full investigation. A reasonable factfinder could conclude that the letters were evidence of bad faith.

Finally, plaintiffs cite deposition testimony from one of the consultants hired by XL Insurance who testified that "XL would have made [all coverage determinations]." ECF No. 59-20, Snyder Dep. at 19:14–20:15. Plaintiffs argue that despite hiring consultants, XL Insurance was clearly predisposed to denying or limiting coverage. For the same reasons discussed above, the court finds that the dispute is largely a factual one, and it is most appropriately left for trial. The court concludes that genuine issues of material fact remain as to whether XL Insurance acted reasonably in investigating, processing, and limiting coverage for plaintiffs' claim.

In summary, the court grants summary judgment as to plaintiffs' fourth cause of action and dismisses the possibility of reformation of the Policy. The court denies summary judgment in all other respects, and the parties remaining claims and counterclaims will proceed to a bench trial.

## IV.  CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiffs' motion for partial summary judgment and **GRANTS IN PART** and **DENIES IN PART** XL Insurance's motion for summary judgment as set forth in this order.

35

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 19, 2023**
**Charleston, South Carolina**